DOMINICK RECCO *et al. v.* THE CHESAPEAKE AND OHIO
RAILWAY COMPANY

(CC 692)

Submitted October 3, 1944.  Decided December 12, 1944.

*Hodges, Revercomb & Michie,* for plaintiffs.
*Fitzpatrick, Strickling & Marshall,* for defendant.

RILEY, JUDGE:

Dominick Recco and Mary Recco, by bill in chancery, filed in the Circuit Court of Kanawha County, sought to compel The Chesapeake and Ohio Railway Company to remove barriers obstructing a railroad crossing in the Town of Hansford, Kanawha County, West Virginia, and to rebuild, reestablish and thereafter maintain the crossing pursuant to a covenant contained in a deed dated March 25, 1870, from Sarah K. Hansford and others to defendant's predecessor in title, Chesapeake and Ohio Railway Company, wherein the grantee covenanted "to build and maintain a good crossing with cattle guards". Plaintiffs demurred to defendant's answer and filed their written motion to strike certain designated portions therefrom. The circuit court overruled the demurrer and motion, decreed the answer to be unobjectionable with reference to the reasons assigned in the motion to strike and, on its own motion, certified here the questions arising upon said motion and demurrer.

The following allegations appear in the bill of complaint:

By deed dated March 25, 1870, Sarah K. Hansford and fourteen others granted to Chesapeake and Ohio Railway Company, defendant's predecessor, a right of way for railroad purposes through their farm of 490 acres. The deed of conveyance provided that the "company is to build and maintain a good crossing with cattle guards * * *". The grantee thereafter constructed a grade crossing, located approximately sixty feet "west of the westerly side of what is presently known as 12th Street in" the Town of

Hansford, and maintained it until February, 1942, when the defendant railway company obstructed it by erecting barriers across the roadway at each entrance to the crossing and destroying that part of the roadway which passed over defendant's railroad tracks and right of way, which plaintiffs contend is in violation of defendant's covenant contained in the deed of March 25, 1870.

In 1921 plaintiffs acquired title to Lot 11 of Block 20; and by deeds of conveyance dated 1934 and 1937, respectively, they were vested with title to Lots 14, 15 and 16 of Block 23 in the Town of Hansford. These lots are part of the acreage through which Sarah K. Hansford and others gave the railroad company the right of way. Plaintiffs assert that due to the obstruction of the crossing which afforded "plaintiffs and others similarly situated, with a good and sufficient means of ingress to and egress from said Town", their mercantile enterprises, established and operated on said property, have suffered a loss of trade from former customers who are now doing "their trading and buying at other and more accessible stores", and that tenants in buildings owned by plaintiffs and situate on said lots have had their businesses so adversely affected by defendant's conduct that the operator of a barber shop surrendered the premises leased to him, a tenant operating a restaurant has demanded a reduction in rental, and another tenant conducting a beauty parlor has complained that the volume and profits of her business have declined to such an extent that she "may surrender the premises now occupied by her"; and plaintiffs complain that such obstruction has caused serious, severe, substantial and continuing injury and damage to plaintiffs and their property, and to the value and rental value thereof.

Plaintiffs assert, and defendant denies, that the covenant to build and maintain a good crossing with cattle guards is a covenant running with the land. Defendant's answer avers that the condition of its predecessor's agreement was "in reality at that time a condition to build and maintain a farm crossing for the use and benefit of the owners of such farm", that many years ago the farm was

subdivided into lots, and that with the "establishment and building up of the Town of Hansford" the crossing became and was used as a public crossing, for many years past under the jurisdiction of the State Road Commission of West Virginia as a part of the public road system, during which period it was not appurtenant to or for the benefit of any particular lots acquired by various purchasers of lots in the subdivision of the 490-acre tract and, therefore, the railway company denies that "under existing circumstances" plaintiffs are entitled to the benefit of said covenant.

Defendant admits that it barricaded the crossing and removed the roadway, but says that the crossing had become a dangerous one "by reason of the increased use thereof by the residents of the Town of Hansford and by the public generally passing up and down the Kanawha Valley through the Town of Hansford, and also by reason of the increased traffic on the tracks of this respondent passing over said crossing", and because thereof defendant and the State Road Commission of West Virginia, a corporation, entered into an agreement on December 25, 1940, by which the crossing was to be vacated and closed upon completion of a grade separation project which would permit the public to pass over defendant's tracks without being subjected to the delays and dangers incident to the use of said grade crossing; and that pursuant to such agreement and subsequent to the "completion of the contract", the Road Commission requested defendant to barricade the crossing, with which request defendant complied; and that, through inadvertence, a formal order abandoning and closing said crossing was not entered until December 30, 1943.

The first defense of the railway company, that the covenant is personal and does not run with the land, is contrary to the decision of this Court in *Lydick* v. *The Baltimore & Ohio Railroad Company,* 17 W. Va. 427.

In defense of the sufficiency of its answer, defendant argues that the covenant is no longer effectual, since the original purpose for which the covenant was created has

ceased to exist and that defendant is entitled to develop such fact. Its argument is premised upon the assertion that the original crossing was for farm purposes. Although the deed containing the covenant discloses that the land, through which the railroad right of way was established, was a farm, it may or may not be true that at the time the covenant was made, the only use to be made of the crossing related to farm purposes. We think this factor to be immaterial. In *Hennen v. Deveny*, 71 W. Va. 629, 77 S. E. 142, it was stated that "The words of the covenant are the primary source from which the intention must be gathered. * * * There is nothing in the language of Burns' deed to the trustees of the church which, in the slightest degree, indicates a purpose to limit the duration of the easement." We are cited to *Uhl v. Ohio River R. Co.*, 47 W. Va. 59, 34 S. E. 934, in which a covenant to make a good crossing and build cattle stops was construed to mean "the customary farm roadway". In that case the land owner sought to use the crossing for piping natural gas to his residence and the Court, though giving the covenant a limited-purpose construction, implied a way of necessity. Judge Brannon objected to the narrow construction on the ground that the crossing "was for use for any purpose which might thereafter be called for in the conveyance from the land of its products * * *". The view expressed by Judge Brannon's dissent finds support in the rule stated in 17 Am. Jur. 996 (Subject, Easements, §98), thus: "An unlimited conveyance of an easement is a grant of unlimited reasonable use", and further, "This rule is based upon the theory that since the parties had an opportunity to limit the uses for which the easement was created, but did not do so, the presumption is that they intended to make no such limitation." These principles and the doctrine of the *Hennen* case impel our conclusion that the crossing was not intended to be limited in its use to farm purposes.

There is no denial that the use of the dominant estate has changed since the grant of 1870. The answer avers that the 490 acres has been subdivided into several hundred town lots, on which is now located the Town of

Hansford, and that with the establishment and growth of the town the crossing "became and was used as a public crossing, and as such for many years past was under the jurisdiction of the State Road Commission of West Virginia, as a part of the public road system of the State", after which the crossing was not appurtenant to or for the benefit of any particular lot or lots of land within the tract as subdivided. In this jurisdiction we are committed to the rule that "Where land is granted with a right of way, the right is appurtenant to every part of the land, and the grantee of any part, no matter how small, is entitled to it; * * *". *Henrie* v. *Johnson*, 28 W. Va. 190. Consonant with such view is the statement in 17 Am. Jur. 1014 (Subject, Easements, Section 126): "An appurtenant easement exists for the benefit of the dominant tenement as an entirety, and not solely for any particular part thereof. The law will not presume that either party at the time of the grant of the easement was ignorant that the grantee had a right to alien a part of his land, or that it was the intention, unless clearly expressed, that by such alienation the easement should be extinguished."

Counsel for the railway argue that defendant is entitled to prove that plaintiffs and their predecessors in title, by their conduct, have dedicated the easement reserved to public purposes, thus effecting an abandonment of their right to enforce the original easement. The answer does aver that the crossing provided for in the deed "became and was used as a public crossing", after which it became a public highway and was used as "a crossing connecting a part of the public road system of West Virginia, which public road system was under the jurisdiction and was maintained by the State of West Virginia", but nowhere in the pleadings which we are appraising is there any allegation of the crossing having been dedicated by plaintiffs or their predecessors in title to the public. The fact that plaintiffs have not objected to the use of the original crossing as a connecting link with the public highway, in the absence of dedication, does not destroy the right to a private crossing. In *Clayton* v. *County Court*, 58 W. Va.

253, 52 S. E. 103, this Court stated: "Though merged in the public use, the easement is not destroyed, for discontinuance of the highway works a dissolution of the merger and leaves the easement still in the hands of its owner." This postulate finds recognition and approval in Tiffany, Real Property, Third Ed., Section 823, wherein there is the further observation that, "If the owner of the right of way joins with the owner of the servient tenement in dedicating the land to such public use, the dedication is obviously binding on him, but it would seem that, as upon the cessation of the public use the owner of the land has the same rights as before the dedication, so the owner of the easement has such rights." The principle adopted in *Clayton* v. *County Court, supra,* obviates the necessity of discussing the cases of *McKinney* v. *Pa. Railroad Co.,* 222 Pa. 48, 70 A. 946, and kindred cases cited by defendant.

Defendant also alleges that the crossing had become a dangerous grade crossing "by reason of the increased use thereof by the residents of the Town of Hansford and by the public generally passing up and down the Kanawha Valley through the Town of Hansford, and also by reason of the increased traffic on the tracks of this respondent passing over said" crossing and that in the interest of public safety and convenience, defendant entered into a contract with the road commission, one result of which was the construction by defendant railway company of a project by which "the public could pass over" its tracks without being subjected to the delays and dangers which had been incident to the use of the crossing which plaintiffs seek to have opened. Are these averments sufficient to deny to plaintiffs the right to have the covenant enforced? We may not lose sight of the fact that the subject of the covenant was a property right *(Warren and wife v. Syme,* 7 W. Va. 474), and a denial of relief to plaintiffs would be a denial to enjoy that right because of a change in conditions between the time when the original crossing was provided and the present time. Performance of a contractual duty has been excused where the basic reason recognized as such by both parties for entering into a contract

has been destroyed by a supervening and unforeseen event (Williston on Contracts, Rev. Ed., Vol. 6, pp. 5418 et seq.); but we are cited to no case in which an easement, created by solemn covenant between competent parties and unlimited thereby as to time or use other than it may not be burdened, has been destroyed, in the absence of some relation between the conduct of the owner or his predecessors in title and the circumstances upon which reliance is had to render ineffective such easement. The construction of the other crossing which defendant seeks to employ here as one of the factors to escape performance of its covenant is designed to meet a traffic condition which reflects the growth not only of the Town of Hansford, but of the area in which it is located and, currently, the increased railroad transportation apparently occasioned by the war; but these are factors for which plaintiffs are not responsible and hence may not be used as a basis to excuse the defendant railway from performing its obligation under the covenant.

We are aware that there are cases where equity's denial to enforce specific performance of covenants has been grounded on a change of conditions. In Symons Pomeroy's Equity Jurisprudence, 5th Ed., Vol. 4, p. 855, the author considers that factor in relation to enforcing performance of *restrictive* covenants contained in deeds of conveyance and states:

> "* * * If therefore, the restrictive covenants in deeds of lots were made with evident reference to the continuance of the existing general condition of the property and its surroundings, but in the lapse of time there has been a complete change in the character of the neighborhood, so as to defeat the purposes of the covenants and to render their enforcement an inequitable and unjust burden on the owner of the lots, then the equitable relief will not be granted, and the plaintiff will be left to his remedy at law—for example, if the covenants restricted the grantees of lots to use for purposes of residence, and since their execution the whole neighborhood had ceased to be used for such pur-

poses, and had been wholly given up to business, manufacturing, and the like."

In *Kaminsky* v. *Barr*, 106 W. Va. 201, 145 S. E. 267, this Court enforced a restrictive building covenant contained in a deed although the change from a residential section to a business section was such that the primary use of buildings in the neighborhood "is still for residential purposes and the business use is incidental merely"; but there are other instances in this jurisdiction where this Court has premised denial of specific performance of a contract because given circumstances rendered it a hardship on the defendant to perform his part of the agreement. See Note 44 W. Va. Law Quarterly, 387. In the above quotation from Pomeroy's Equity Jurisprudence, the author is definite that those cases which refuse relief illustrate but a limitation upon the general rule that equity does enforce performance of restrictive covenants whether the party litigant who seeks enforcement is in legal privity with the defendant or relies merely upon an equitable easement or servitude.

Restrictions such as covenants "not to build nearer the street than a certain line, or not to build certain kinds of buildings, or not to use the lots for certain purposes, or not to build so as to cut off a certain prospect * * *" (Pomeroy's Equity Jurisprudence, *idem,* p. 853) are not to be confused with a covenant, the effect of which is to create in the owner of the dominant estate a vested legal property interest in a servient estate, with the concomitant right to the owner thereof to enjoy the same. Where an owner of land divides it into lots and sells the lots to different grantees by deeds containing the same negative or affirmative covenants, and the lots are sold to subsequent grantees, each will be charged with constructive notice of the covenants in the original deed under which he claims title. Though there would be no legal privity among the subsequent grantees and therefore one lot owner cannot maintain an action at law against the owner of any other lot, based upon the latter's violation of any of the covenants, a suit in equity may be brought by an

original grantee or subsequent grantee against the owner of any other lot to compel compliance with the covenants contained in the original deeds on the theory that they created an equitable easèment or servitude. But where changed conditions will render the enforcement of the covenants inequitable or unjustly burdensome, relief in equity will not be granted. Symons, Pomeroy's Equity Jurisprudence, 5th Ed., Section 1295. Unlike the instant covenant, privity between the parties is not prerequisite to the enforcement of such equitable easement or servitude. A court of equity will enforce such covenants, notwithstanding there may be no legal right, because of the derelict lot owner's inequitable conduct in the violation of the covenants. By the same token, relief will be withheld where it would be inequitable to grant it. The Court simply balances the equities between the contending parties, which it will not do if a vested property right, such as is clearly shown by this record, will be destroyed thereby.

The railway company cites *Harper* v. *The Virginian Railway Co.*, 76 W. Va. 788, 86 S. E. 919, and *Brown* v. *Western Maryland Railroad Co.*, 84 W. Va. 271, 99 S. E. 457, to support its contention that the covenant entered into by a railway company will not be specifically enforced if the enforcement thereof will adversely affect the performance by the railway company of a public duty. In the *Brown* case it was recognized that the railroad contract "stands upon no higher or different plane than the contract of any other corporation or individual * * * except, however, that equity may decline to exert its coercive power to compel specific performance of such contract if to do so will adversely affect the performance by the railroad of its full public duties." In the *Harper* case plaintiff sought to enforce a covenant of the railroad company to erect on the grantor's land a depot for the general accommodation of the public. This Court granted relief to plaintiff "so long and so long only as it may be done consistently with the public interests and the duties and obligations of the railway company in respect thereto, and

it has not become unduly burdensome and oppressive to continue compliance therewith". Syl. pt. 6. There is no averment by the instant defendant in its answer that enforcement of the covenant under consideration would be burdensome, oppressive, or inequitable, nor does its answer aver that performance of the covenant would adversely affect the performance of its public duty. Furthermore, it may not be overlooked that the covenant in the *Harper* case did not create an easement as does the covenant which plaintiffs herein seek to enforce.

Defendant railway company argues that the crossing, if permitted to be reopened, will be a public crossing. Our attention is directed to plaintiffs' bill of complaint, which undeniably alleges that the purpose of reopening and re-establishing the crossing will be for use not only by plaintiffs and others similarly situated, but as a means of ingress and egress to plaintiffs' property which is used for commercial purposes. The fact that the public generally may use the crossing for such purposes does not, of course, make of it a public crossing in a legal sense. Since plaintiffs rely upon the covenant in the deed of 1870, clearly defendant's duty to plaintiffs is measured by the requirements thereof. What plaintiffs' predecessors in title and the railway company considered "a good crossing" and what type of crossing the company actually provided pursuant to the covenant are factual matters with which we are not concerned in this appraisal of defendant's answer.

For the foregoing reasons, we are of opinion that the trial court erred in overruling the plaintiffs' motion to strike those portions of defendant's answer which related to such defenses and plaintiffs' demurrer to the answer. The rulings of the circuit court are therefore reversed.

*Rulings reversed.*

Fox, JUDGE, dissenting:

My inability to concur in the majority opinion in this case does not rest so much upon disagreement with the majority view on the legal principles discussed and approved therein, but upon the practical situation presented

by the pleadings, which, in my opinion, makes impracticable the enforcement of the covenant in question in a way that would save to the plaintiffs rights having any substantial value, especially when we compare them with the increased burdens sought to be imposed upon the defendant, and the attendant dangers to the public from the use of the crossing in question, should even a limited use thereof be permitted.

The deed upon which the plaintiffs rely in this suit was executed more than seventy-five years ago. The right-of-way conveyed by the deed ran through a farm of 490 acres. The crossing provided for therein was "a good crossing with cattle guards", and while not specifically defined as a farm crossing, must, in all reason, be so treated.

Later there was industrial development in that vicinity, and the use of the 490 acres of land as a farm was discontinued. In its place came a large population, most of whom engaged in industrial pursuits, particularly mining and railway employment, and in various types of business which followed as a natural consequence. A town, Hansford, was located and built on a part of the farm, and the balance was divided into small lots, now occupied for purposes other than agricultural. These changed conditions called for some action on the part of the public authorities, and a public road was established, which covered and used the private crossing over the railway provided for in the deed in question. Still later, increased population, greater use of highways occasioned by the development of motor vehicles, and, we may assume, concern for the safety of those who used that particular highway, called for a relocation thereof in the vicinity of this crossing, with the result that the use of the crossing, provided for in the covenant in the deed aforesaid, as a public highway, was discontinued. Before such discontinuance the plaintiffs had purchased four small lots of the original farm, on which was established what they say was a profitable business, the continuance of which, they state, is largely dependent upon the access thereto provided by the cross-

ing so discontinued. When the public authorities discontinued the use of the crossing as a public highway, the defendant railway company closed the crossing for all purposes, and this suit followed.

The majority opinion, as I understand it, holds that the covenant in the deed of 1870, providing for the crossing in question, was one running with the land; and that the plaintiffs, as owners of a part of the land to which the covenant related, are entitled to have the same enforced for their benefit. It also holds them to be entitled to use the crossing in the same form, and to the same extent, as the original grantors were entitled to use the same in 1870, but no further. I agree that the covenant is one running with the land, but, I think, one which, in view of changed conditions, referred to above, cannot now be enforced; further, that being, in fact, a covenant for a farm crossing, and the land through which the right-of-way was conveyed being no longer used as a farm, there is no call or use for a farm crossing; wherefore, the covenant becomes unenforceable because of lack of any situation to which it can be applied. Regrettable as the situation of the plaintiffs may be, it is no different from that of many others whose property and rights have been injuriously affected by relocations of highways, and the manifold changes in values brought about by location of industrial plants and facilities, or their abandonment. This is a changing world, and owners of property hold the same subject to the vicissitudes of fortune, up or down, resulting from changed conditions, and the passing of time. For all those injuriously affected on such circumstances, I have sympathy; but in the matter of relief therefrom, I think the law is often helpless, and, in my opinion, this is such a case.

I think it must be admitted, and I understand the majority opinion as necessarily conceding, that the plaintiffs are not entitled to impose upon the railway company a burden greater than that provided for by the covenant in question. If this be true, how can the maintenance of a crossing, having any value to the plaintiffs, be said to be the crossing contemplated by the parties to the 1870

deed? That was "a good crossing with cattle guards". I think it fair to say that the use contemplated was the ordinary farm use, and by those owning the farm, or having business with its owners, should there be more than one. Now, notwithstanding the limitation attempted to be placed upon the character of the crossing to which the plaintiffs are held to be entitled, to be of any value whatever in these modern days, it must be a crossing which can be used by pedestrians, and all character of vehicular travel, including motor vehicles. Who will say that "a good crossing with cattle guards" contemplated a crossing which could be used by the character of traffic now carried on throughout this state, and this particular community? In 1870 there was probably not a paved highway in any rural community in this state, and motor vehicles were nonexistent. What was contemplated at the date of the deed containing the covenant was a private crossing. Now, in the light of the plaintiffs' situation, to be of any substantial value there must be a crossing which the public is entitled to use, through the means of transportation commonly available and used. They want a crossing which will permit the public to freely reach their place of business, and those of their tenants, so that all may reap profits therefrom. I can understand their position, and find no fault with their natural desire to protect the value of their property; but this Court may not, in a desire to aid them, impose a burden on another not contemplated, or provided for, in the deed on which the plaintiffs' claim is based. I think the solution which the Court is attempting to bring about is impossible of execution, without imposing a burden on the railway company, which was never contemplated it would be required to bear. In such a situation, the conditions under which the covenant was made having passed beyond recall, I think we should find that there is now no basis for any relief thereunder, and leave to public authorities the task of providing the plaintiffs, and others similarly situated, with reasonable access to the public highways in that vicinity.

I am not in sympathy with the contention of counsel

for the railway company that because the crossing provided for in the covenant has developed into an obstacle to the efficient operation of the railway, and one of danger to those using the crossing, they were justified in violating a covenant otherwise enforceable. My dissatisfaction with the majority opinion is based solely upon the ground that, at this late day, and under changed conditions, and as a practical proposition, it is impossible to enforce the covenant in question, to the extent of giving the plaintiffs any substantial right, without at the same time imposing a burden on the railway company never contemplated by any of the parties to the deed of 1870. I would sustain the ruling of the Circuit Court of Kanawha County on the questions certified.